IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**FILED**

NOV 12 2015

MICHAEL E. KUNZ, Clerk
By _____ Dep. Clerk

| | | |
|---|---|---|
| ALEXANDER JOSEPH BERNSTEIN,<br>11 Soundview Drive<br>Port Jefferson, NY 11777, | : <br> : <br> : <br> : | **CIVIL ACTION** |
| | : | |
| Plaintiff, | : <br> : | **No.** |
| | : | |
| vs. | : <br> : | |
| | : | |
| TROOPER NICHOLAS GOLDSMITH,<br>Pennsylvania State Police<br>Troop M Fogelsville<br>8320 Schantz Road<br>Breinigsville, PA 18031, | : <br> : <br> : <br> : <br> : | **Section 1983**<br>**Civil Rights Action** |
| | : | |
| TROOPER JUSTIN JULIUS,<br>Pennsylvania State Police<br>Troop M Fogelsville<br>8320 Schantz Road<br>Breinigsville, PA 18031, | : <br> : <br> : <br> : <br> : | **Jury Trial Demanded** |
| | : | |
| COLONEL FRANCIS J. NOONAN,<br>Former Commissioner of the Pennsylvania<br>State Police<br>1800 Elmerton Avenue<br>Harrisburg, PA 17110, | : <br> : <br> : <br> : <br> : | |
| | : | |
| LT. COLONEL TIMOTHY J. MERCER,<br>Deputy Commissioner of Administration and<br>Professional Responsibility of the<br>Pennsylvania State Police<br>1800 Elmerton Avenue<br>Harrisburg, PA 17110, | : <br> : <br> : <br> : <br> : <br> : | |
| | : | |
| MAJOR ROBERT EVANCHICK,<br>Director of the Bureau of Integrity and<br>Professional Standards of the<br>Pennsylvania State Police | : <br> : <br> : <br> : | |

1

7820 Allentown Boulevard          :
Harrisuburg, PA 17112,            :
                                  :
MAJOR JOSEPH L. REED,             :
Commander Area I / Bureau Director :
of the Pennsylvania State Police  :
2930 Airport Road                 :
Bethlehem, PA 18017               :
                                  :
CAPTAIN BRIAN S. TOBIN,           :
Troop M Fogelsville Commander and Division :
Director of the Pennsylvania State Police :
2930 Airport Road                 :
Bethlehem, PA 18107,              :
                                  :
SAFARILAND, LLC,                  :
13386 International Parkway        :
Jacksonville, FL 32218,           :
                                  :
        AND                       :
                                  :
JOHN DOE DISTRUBUTORS,            :
                                  :
        Defendants.               :

## COMPLAINT

**NOW COMES**, the Plaintiff **ALEXANDER BERNSTEIN**, by and through

his legal counsel, Joshua E. Karoly, Esquire, and with him Karoly Law Firm, LLC,

and does hereby allege and aver the following:

## I.   JURISDICTION AND VENUE

1.   This action is instituted under the United States Constitution, particularly

     under the provisions of the Fourth and Fourteenth Amendments, and under

2

federal law, particularly the Civil Rights Act of 1871 hereinafter referred to as the "Act," as amended, 42 U.S.C. § 1983.

2.  This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1331, § 1343(a)(3), § 1343(a)(4), and § 1367(a) regarding the principles of pendent and supplemental jurisdiction over related state law claims.

3.  Venue in the Eastern District is properly laid pursuant to 28 U.S.C. § 1391, insofar as the alleged unlawful conduct asserted in this Complaint, which forms the factual and legal basis of the Plaintiff's claims, arose within the geographical limits of this District in general and within the geographical limits of South Whitehall Township, Pennsylvania, in particular.

## II.   PARTIES

4.  Plaintiff Alexander Bernstein (hereinafter "Bernstein" or "Plaintiff") is an adult individual, with a home address of 11 Soundview Drive, Port Jefferson, NY 11777.

5.  Defendant Trooper Nicholas Goldsmith (hereinafter "Goldsmith") is an adult individual who, at all times relevant hereto, was a Pennsylvania State Police Trooper assigned to Troop M Fogelsville, located at 8320 Schantz Road, Breiningsville, Pennsylvania 18013, and was entrusted with the power, under color of law, to enforce the laws of the Commonwealth of

3

Pennsylvania, and to protect the Constitutional rights of those he encountered.

6. Defendant Trooper Justin Julius (hereinafter "Julius") is an adult individual who, at all times relevant hereto, was a Pennsylvania State Police Trooper assigned to Troop M Fogelsville, located at 8320 Schantz Road, Breiningsville, Pennsylvania 18013, and was entrusted with the power, under color of law, to enforce the laws of the Commonwealth of Pennsylvania, and to protect the Constitutional rights of those he encountered.

7. Defendant Colonel Francis J. Noonan (hereinafter "Noonan") was at all times pertinent to the claims asserted herein, the Commissioner of the Pennsylvania State Police (hereinafter "PSP") and was responsible for formulating and implementing PSP policies and programs and/or supervising the PSP.

8. Defendant Lt. Colonel Timothy J. Mercer (hereinafter "Mercer") was at all times pertinent to the claims asserted herein the Deputy Commissioner of Administration and Professional Responsibility who (or his designee), inter alia, is charged with forwarding investigative reports to the appropriate Area Commander / Bureau Director for review.

4

9.  Defendant Major Robert Evanchick (hereinafter "Evanchick") was at all times pertinent to the claims asserted herein, the Director of the Bureau of Integrity and Professional Standards. It is his job to, inter alia, review General Investigative Reports (hereinafter "GIRs") for investigative content, and then to either forward same to the Deputy Commissioner of Administration for further processing, or return said GIRs to the investigator for additional investigation.

10. Defendant Major Joseph L. Reed (hereinafter "Reed") was at all times pertinent to the claims asserted herein, the Commander of Area I / Bureau Director who is responsible for reviewing the GIRs and for forwarding them to the Troop Commander / Division Director, and who is also responsible for issuing Disciplinary Action Reports (hereinafter "DARs") when appropriate.

11. Captain Brian S. Tobin (hereinafter "Tobin") was at all times pertinent to the claims asserted herein, the Troop M Commander / Division Director who is responsible, inter alia, for formulating an Administrative Decision concerning improper conduct committed by any member of the PSP.

12. Each of the above identified individuals has supervisory responsibilities which are far more extensive than briefly stated above, and each was a "supervisor" of Defendant Troopers Goldsmith and Julius as that term is

utilized in Section 1983 actions, at all times pertinent to the claims asserted herein.

13. These Defendants, Noonan, Mercer, Evanchick, Reed and Tobin (hereinafter "Supervisory Defendants"), were supervisors within the context of 42 U.S.C. § 1983 because each of them was personally involved with policy determinations, monitoring and enforcement of, among other things, training, defining performance by promulgating rules or otherwise, monitoring adherence to performance standards, and responding to unacceptable performance whether through individualized discipline or further rule making.

14. To the extent that discovery reveals that any one of the foregoing Supervisory Defendants lawfully designated another person or persons to act as their designee(s), the allegations of supervisory liability made herein are intended to, and do expressly also apply to said designee.

15. Defendant Safariland, LLC (hereinafter "Safariland") is a corporation existing under the laws of the State of Florida with its principal place of business located at 13386 International Parkway, Jacksonville, Florida, 32218. Safariland designed, manufactured, sold and distributed the "NIK Test Kit 'G'" (hereinafter "NIK," the "Test Kit," the "Kit" and/or the "device."

16. Defendant John Doe Distributors (hereinafter "Distributor") is a person(s) or entity presently unknown to Plaintiff but who, or which, is also responsible for distributing the NIK Test Kit "G" to the Commonwealth of Pennsylvania and/or the Pennsylvania State Police, or an intermediary.

## III.   PRE-DISCOVERY FACTUAL ALLEGATIONS

17. On November 13, 2013, at or about 11:30 p.m., Plaintiff Alexander Bernstein was the guest passenger in a rented 2013 Mercedes Benz 350 automobile, being operated by a female friend in a westbound direction on Interstate 78, in South Whitehall Township, Pennsylvania.

18. A marked Pennsylvania State Police vehicle being operated by Trooper Nicholas Goldsmith, partnered with Trooper Justin Julius, signaled for the Mercedes to pull over, and the operator immediately complied.

19. Both Troopers approached the Mercedes and asked both the operator and the Plaintiff to produce their driver's licenses, registration and insurance.

20. One of the Troopers advised the operator that she was stopped for "going 60 in a 55 zone, and for traveling too close to the centerline."

21. Plaintiff believes that neither allegation was true.

22. In fact, Plaintiff believes, and therefore avers, that the stop of the vehicle was pre-textual and unjustified, and was the product of un-Constitutional profiling, based upon, inter alia, the following facts:

    a.  the vehicle was not exceeding the speed limit or being operated too close to the middle line;

    b.  even if it were, surrounding vehicles were being operated in a similar fashion and were not stopped;

    c.  the speeding alleged was a *de minimus* five miles per hour over the 55 mile per hour speed limit, and constitutes a limit which is rarely enforced on this thoroughfare;

    d.  the vehicle was being operated by a Hispanic female; and

    e.  the vehicle had an out of state (Tennessee) license plate and was a rental vehicle (which, among other things, made the occupants persons less likely to return to Pennsylvania to contest even an unfounded motor vehicle violation).

23. Trooper Goldsmith directed both occupants to exit the vehicle, without justification or explanation.

24. Both occupants denied that there were any drugs in the vehicle, and when asked the operator gave both oral and written consent to search the vehicle ("PSP Waiver of Rights and Consent to Search" form).

8

25. Trooper Goldsmith continued to press Plaintiff by questioning him about "how much marijuana he had in the car," and Plaintiff continued to respond that he had "none." Plaintiff replied further that all he had in the car was a white bag in the trunk containing his toiletries and some clothing.

26. Although he had no probable cause to do so, Trooper Goldsmith asked for the Plaintiff's consent to search his white bag in the trunk and Plaintiff consented.

27. One of the Troopers asked the operator what they (the Troopers) were going to find when they searched the trunk, besides the Plaintiff's white bag, and she replied that she had placed a black plastic bag in the trunk containing two packages of soap that she had made, and nothing more.

28. In the open area of the trunk, Trooper Julius found the Plaintiff's white bag with the contents exactly as described by Plaintiff; and in a factory made storage container in the trunk, he also found the soap, exactly as described by the operator.

29. The Plaintiff was asked what he knew about the soap, the Plaintiff thought the Troopers were playing with him, but he replied that he knew nothing about it or anything else that might have been in closed storage in the trunk and therefore not visible to him.

9

30. The operator also corroborated the fact that she did not have reason to tell the Plaintiff about the soap, and didn't. And then she politely asked, "what's the big deal about the soap?" or words to that effect.

31. One of the Troopers responded, because it looks like drugs.

32. The operator replied, incredulously, "it's just soap. Smell it, taste it if you want, its just soap. I would never have anything to do with drugs. What's going on here?" – or words to that effect.

33. The Troopers had a brief discussion that Plaintiff found difficult to hear, and then they placed the Plaintiff and the operator under arrest, handcuffed them and transported them to State Police Headquarters based solely upon the false claim that they possessed what the Troopers referred to as "a controlled substance of some kind."

34. At the State Police Headquarters, the Plaintiff and the operator were confined in holding cells.

35. The Plaintiff believes, and therefore avers, that, if not previously, it was during this brief discussion that Defendant Troopers Goldsmith and Julius entered into a conspiracy, thereby agreeing to arrest and prosecute the Plaintiff (and the operator), even though they lacked probable cause for same, and even though it was obvious that what they called a controlled substance of some kind, was just soap.

36.    While at the State Police Barracks, Plaintiff pretended to be asleep so he could overhear the Defendant Troopers who were speaking to each other nearby. One said to the other (in obvious reference to a field test of the soap), "this isn't positive" and the response from the other was, "Well . . . make it positive!"

37.    The Plaintiff believes and therefore avers that Defendant Trooper Goldsmith and Defendant Trooper Julius either entered into a conspiracy, or confirmed their prior conspiracy, that they would criminally prosecute and incarcerate the Plaintiff and the operator even though it was clear that neither had committed a crime. Moreover, they furthered the conspiracy by agreeing that they would falsely report the "negative" results which they received from two separate "NIK test Kit G's" (one testing each package) as being positive; and that they would accomplish this by Defendant Goldsmith's falsely swearing to a knowingly untrue Affidavit of Probable Cause and by Defendant Goldsmith's false filing of a Police Criminal Complaint, charging the Plaintiff (and the operator) with criminal charges consisting of: one count of Criminal Conspiracy To Possess With Intent To Deliver A Controlled Substance – Cocaine, in violation of 35 C.S.D.D.C.A. § 780-113 (a)(30) and § 903 (a)(1) of the Pa. Crimes Code; one Count of Knowingly Manufacturing, Delivering Or Possessing With

The Intent To Manufacture Or Deliver Cocaine in violation of 35 C.S.D.D.A. § 780-113 (a)(30); and one Count of Possession of Cocaine in violation of 35 C.S.D.D.C.A. § 780(a)(16), two felonies and a misdemeanor, respectively.

38. Defendant Trooper Julius further agreed with Defendant Trooper Goldsmith that while Goldsmith would swear out a false Affidavit of Probable Cause and a false Criminal Complaint, that Julius would likewise prepare and execute a false police report consistent with Goldsmith's false Affidavit and Complaint, intentionally and knowingly declaring the field test results to be positive for cocaine when, in fact, each was negative.

39. It is averred upon information and belief that Defendants Goldsmith and Julius, and other members of the Pennsylvania State Police, had falsely reported field test results on prior occasions, and that this was a practice and custom, to which the Supervisory Defendants herein were deliberately indifferent, and was one which they condoned, if not encouraged, as more fully set forth hereinafter, at length.

40. Because of the seriousness of the false charges brought by Defendants against Plaintiff, and because of Defendants recommendations for high bail and "proof of funds," Magisterial District Judge Jacob E. Hammond, on November 14, 2013, set Plaintiff's bail at an unobtainable One Half a

Million Dollars ($500,000.00) cash bail. Plaintiff was immediately committed to Lehigh County Prison where he remained for 29 days, until December 10, 2013 when, one day following a hearing upon Plaintiff's attorney's "Motion to Reduce Bail and Determine Legitimate Source of Funds," Judge Robert L. Steinberg determined that the bail was excessive and unnecessary and reduced same to $25,000.00 cash (i.e. $250,000.00, 10% bail), which Plaintiff posted.

41.   In the interim period between his arrest, imprisonment and his release on bond – a period of 29 days, Plaintiff lost his job, his possessions, and lost his apartment, rendering him homeless, and destitute.

42.   While the Plaintiff was incarcerated on these false criminal charges, the Pennsylvania State Police Crime Lab tested the contents of the same two packages that the Defendants claimed had field tested positive for cocaine using two NIK Test Kit "Gs."

43.   All the laboratory tests performed on the substance which the operator claimed, from the beginning, constituted nothing more than soap, confirmed that the packages contained no cocaine, and no other drugs or controlled substances, but merely soap.

44.   On December 12, 2013, after Plaintiff had spent 29 days unlawfully incarcerated, and 48 hours after he had paid $32,523.85 in bail and court

13

costs, and <u>after</u> Plaintiff had incurred substantial legal fees for his Lehigh County Court hearing and proceeding, as well as his preliminary hearing scheduled for later that same day, the Commonwealth withdrew the fabricated criminal charges (which the Defendants, acting as co-conspirators, had falsely filed against the Plaintiff and the operator).

45.   The Plaintiff did not so much as receive an apology from the Defendants.

46.   Under the law of the Commonwealth of Pennsylvania, even though all Plaintiff's criminal charges were withdrawn, they remain a part of Plaintiff's criminal record, unless and until they are expunged, by Court Order.

47.   Accordingly, Plaintiff will have to incur additional legal fees and costs in an attempt to have the Court expunge each of the unfounded criminal charges from his record. And, even then, the FBI, the internet and other media sources will still contain a permanent record of his arrest and the criminal charges upon which he was maliciously prosecuted.

48.   As a direct and proximate result of the acts, and omissions committed by the named Defendants herein, as detailed above, and as further articulated in the paragraphs which follow, Plaintiff was caused to suffer, <u>inter alia</u>, the following harms, injuries and damages, some or all of which may be permanent and/or continuing in nature:

14

a. loss of liberty;

b. invasion of his privacy and freedom of association;

c. damage to his reputation;

d. emotional distress and anguish;

e. loss of life's pleasures;

f. loss of employment, income and shortening of economic horizons;

g. loss of living accommodations;

h. significant attorney's fees and costs; and

i. loss of $25,000.00 paid as a bail premium, and $7,523.85 in related costs.

49. Alternatively, Plaintiff alleges that, should it be determined that the Safariland's Test Kit "G," which was designed, manufactured and sold by Defendant Safariland, LLC, and distributed by Defendant John Doe Distributors, actually produced two separate false positive readings for cocaine, that said product was defective in the condition in which it was designed, manufactured, sold and distributed and placed into the stream of commerce, and/or contained defective warnings and/or instructions for its use and/or regarding its inherent limitations and known failability.

50.    Under such circumstances, Plaintiff believes and therefore avers, that
       Defendants Safariland and John Doe Distributors are jointly and
       severally liable to Plaintiff, along with the other Defendants, based upon
       the claims, assertions and theories of liability more fully set forth
       hereinafter.

51.    In like fashion, and for their part, the Supervisory PSP Defendants, are
       also jointly and severally liable to Plaintiff based upon the claims,
       assertions and theories of liability more fully set forth hereinafter.

52.    The acts and/or omissions of the Defendants, or one or more of them,
       evidenced a deliberate indifference to the rights guaranteed to individuals
       such as Plaintiff, under the Fourth and Fourteenth Amendments to the
       United States Constitution, and Pennsylvania Constitution.

53.    At all times relevant, the legal principles regarding the rights of persons,
       such as Plaintiff, and the contours of those Constitutional and statutory
       rights, were well-established, and it was not reasonable for any Defendant
       to believe that his actions would not deprive the Plaintiff of those rights.

54.    At all times during the events described herein, the Defendants were
       engaged in one or more joint ventures which combined to produce the
       Constitutional violations and other harms asserted herein. The Defendants

assisted each other in performing the various actions described, and lent their physical presence, support and/or authority to one another.

55.    The Plaintiff further believes and therefore avers, that without the intervention of this Honorable Court, the Plaintiff, as well as others, may suffer from state and federal rights violations similarly and that, consequently, injunctive relief is demanded, and required.

56.    The Defendants, individually and collectively, at all time pertinent to the claims asserted herein, acted under color of law.

57.    While acting under color of law, the Defendants deprived the Plaintiff of various State and Federal Constitutional rights as more fully set forth herein.

58.    At all places where reference to the Pennsylvania State Police is made hereinafter, "PSP" may be used, including reference to all Pennsylvania State Police Defendants collectively as, the "PSP Defendants."

59.    The PSP Defendants are sued in their individual capacities pursuant to 42 U.S.C. § 1983 ("Section 1983"), for their actions, all of which occurred under color of law and, accordingly, neither 11th Amendment immunity, nor sovereign immunity applies.

60.    Relative to the pendant state claims asserted, the PSP Defendants' acts and omissions are alleged to have been committed outside the scope of

their employment, and therefore are not subject to sovereign (state legislated immunity, 1 Pa. C.S.A. § 2310), immunity. The injunctive relief sought against these Defendants is sought in their official capacities for which they are likewise not immunized.

## COUNT I
## 42 U.S.C. § 1983
### Unlawful Seizure / False Arrest
### *Against Individual Defendants Goldsmith and Julius*
### *(And Against All Defendants By Incorporation)*

61.   The preceding paragraphs are incorporated herein by reference as though fully set forth.

62.   The conduct of Defendants Goldsmith and Julius constituted an unlawful seizure of the Plaintiff, within the meaning of the Fourth Amendment.

63.   Said seizure was made by warrantless arrest and was unreasonable and without probable cause in that the facts and circumstances available to the Defendants would not warrant a prudent officer in believing that the Plaintiff had committed or was committing a crime, which would justify his arrest.

64.   The Plaintiff was subjected to this unlawful seizure and arrest in violation of the Fourth Amendment of the United States Constitution.

65.   As a result of the unlawful seizure and false arrest affected upon the Plaintiff, the Plaintiff suffered damages as stated herein.

66. Defendants Goldsmith and Julius are personally liable for their direct involvement in the commission of the acts complained of here.

67. All other Defendants are liable for the acts of Defendants Goldsmith and Julius pursuant to the claims and theories expressly set forth hereinafter, and which are incorporated by reference as if set forth et extenso here.

68. Further, the conduct exhibited by subordinate Troopers Goldsmith and Julius, which occurred on or about November 13-14, 2013, was not unexpected. Neither were they the deeds of independent, non-supervisory actors. But, rather, they constituted predictable behaviors of subordinates who operated with perceived impunity due to the deliberate indifference of their supervisors and policymakers, and the joint policies, practices and customs, of all other Defendants which operated as the moving force behind what the Troopers believed to be their unaccountable efforts to engage in what had become, all to customary, Constitutional deprivations.

69. The likelihood is that, but for the alleged acts and omissions committed by the other Defendants, the injuries inflicted upon the Plaintiff would not have occurred.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against all Defendants, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00)

limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania.

## COUNT II
### 42 U.S.C. § 1983
### False Imprisonment
*Against Individual Defendants Goldsmith and Julius*
*(And Against All Defendants By Incorporation)*

70.  The preceding paragraphs are incorporated herein by reference as though fully set forth.

71.  Defendants Goldsmith and Julius either individually, or acting in concert, subjected the Plaintiff to false imprisonment in violation of his Constitutionally protected Fourth Amendment rights.

72.  The Defendants deliberately arrested, and thereafter deliberately further detained, the Plaintiff in custody.

73.  Said detention was unlawful because it lacked probable cause.

74.  The facts and circumstances, which were within the knowledge of the Defendants at the time of Plaintiff's arrest, were not sufficient to warrant a man of reasonable caution to believe that Plaintiff had committed or was committing a crime for which an arrest and imprisonment was authorized under the law.

75.  As a result of being subjected to False Imprisonment, in violation of his Constitutionally protected rights under the Fourth Amendment, Plaintiff suffered the damages alleged herein.

76.  All other Defendants are liable for the acts of Defendants Goldsmith and Julius pursuant to the claims and theories expressly set forth hereinafter and are incorporated by reference as if set forth et extenso here.

77.  Further, the conduct exhibited by subordinate Troopers Goldsmith and Julius, which occurred on or about November 13-14, 2013, was not unexpected. Neither were they the deeds of independent, non-supervisory actors. But, rather, they constituted predictable behaviors of subordinates who operated with perceived impunity due to the deliberate indifference of their supervisors and policymakers, and the joint policies, practices and customs, of all other Defendants which operated as the moving force behind what the Troopers believed to be their unaccountable efforts to engage in what had become, all to customary, Constitutional deprivations.

78.  The likelihood is that, but for the alleged acts and omissions committed by the other Defendants, the injuries inflicted upon the Plaintiff would not have occurred.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against all Defendants, jointly and severally,

21

in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania.

**COUNT III**
**42 U.S.C. § 1983**
**Malicious Prosecution**
*Against Individual Defendants Goldsmith and Julius*
*(And Against All Defendants By Incorporation)*

79.    The preceding paragraphs are incorporated herein by reference as though fully set forth.

80.    On November 13-14, 2013, Plaintiff was falsely charged by Defendant Goldsmith via Criminal Complaint, aided and abetted by the acts and additional official false filing(s) of Julius.

81.    The Plaintiff was charged with Criminal Conspiracy To Possess With Intent To Deliver A Controlled Substance – Cocaine (35 C.S.D.D.C.A. § 780-113 (A)(30), 18 Pa. C.S.A. 903 (a)(1) – F); Knowingly Manufacturing, Delivering Or Possessing With The Intent To Manufacture Or Deliver Cocaine (35 C.S.D.D.A. § 780-113 (A)(30) – F); and Possession of Cocaine (35 C.S.D.D.C.A. § 780(a)(16) – M).

82.    On December 12, 2013 the day of Plaintiff's preliminary hearing, all charges against Plaintiff were withdrawn based upon Defendants

Goldsmith's and Julius' failure to establish probable cause to believe that a crime was committed and that Plaintiff committed a crime.

83. Plaintiff retained undersigned counsel for the preliminary hearing and was forced to pay substantial sums for counsel fees and costs to defend the unjust charges.

84. The Defendants, acting in concert, violated the Plaintiff's Fourth Amendment rights by wrongfully initiating the prosecution of Plaintiff for the above-referenced crimes.

85. The aforesaid criminal prosecution was designed, procured, facilitated, and promoted by both the subscribing and the non-subscribing Defendants acting in concert to initiate the prosecution as a pretext, defense and unwarranted justification for the Defendants' unlawful and un-Constitutional violation of the Plaintiff's state and federally protected Constitutional rights.

86. The Defendants lacked probable cause to initiate the said criminal proceeding against the Plaintiff, as was established by their being forced to withdraw all charges due to their inability to prove even a prima facie case.

87. The criminal proceeding in the case ended in Plaintiff's favor.

88. The Defendants acted maliciously, as stated, or for a purpose other than bringing the Plaintiff to justice.

89. The Plaintiff spent 29 days in prison as a result of the Defendants' malicious bringing of the unjust and unfounded criminal charges.

90. Defendants Goldsmith and Julius are personally liable for their direct involvement in the commission of the acts complained of here.

91. All other Defendants are liable for the acts of Defendants Goldsmith and Julius pursuant to the claims and theories expressly set forth hereinafter, and are incorporated by reference as if set forth et extenso here.

92. Further, the conduct exhibited by subordinate Troopers Goldsmith and Julius, which occurred on or about November 13-14, 2013, was not unexpected. Neither were they the deeds of independent, non-supervisory actors. But, rather, they constituted predictable behaviors of subordinates who operated with perceived impunity due to the deliberate indifference of their supervisors and policymakers, and the joint policies, practices and customs, of all other Defendants which operated as the moving force behind what the Troopers believed to be their unaccountable efforts to engage in what had become, all to customary, Constitutional deprivations.

93. As a consequence of the criminal proceeding, the Plaintiff suffered a significant deprivation of his liberty, freedom and property right in his reputation, and claims damages for the injuries set forth herein.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against all Defendants, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania.

**COUNT IV**
**42 U.S.C. § 1983**
**Civil Conspiracy**
*Against All Defendants*

94.   The preceding paragraphs are incorporated herein by reference as  though fully set forth.

95.   The referenced Defendants participated in a conspiracy to violate the Plaintiff's Constitutional rights.

96.   Direct evidence of a conspiracy is rarely available and therefore, the existence of a conspiracy must usually be inferred from the circumstances.

97.   Those circumstances establishing a conspiracy here are very compelling:

      a.   The Defendant Troopers were on "assignment" together;

      b.   It is believed, and therefore averred, that the Defendant Troopers chose to work this "assignment" together;

      c.   Both participated in the events which deliberately caused the un-Constitutional arrest, prosecution and imprisonment of Plaintiff, and neither one cautioned, restrained or prevented

the other from engaging in this wrongdoing even though the opportunity clearly existed to do so, and even though the obligation to do so also existed;

d.    The Defendant Troopers acted fully in concert – one with the other, obviously demonstrating the common plan, scheme or design that they had previously agreed upon when they first encountered Plaintiff;

e.    The Defendant Troopers agreed thereafter to fabricate, and did fabricate, a continued story wherein they falsely depicted Plaintiff as a possessors, manufacturer, deliverer, and over-all trafficking conspirator, of cocaine;

f.    The sole purpose of this fabrication was in an attempt to excuse or otherwise justify and cover-up the unConstitutional stop, arrest, prosecution and confinement of Plaintiff and the deprivations they had committed of his Constitutionally guaranteed civil rights;

g.    The Defendants' conspiratorial acts continued and included aiding and abetting each other in Goldsmith's swearing out a knowingly false police Criminal Complaint and supporting Probable Cause Affidavit against Plaintiff, and Julius' filing

of a falsely-mirrored official report, even though each knew that Plaintiff was guilty of no wrongdoing;

h.   The Defendants' conspiratorial acts continued and included the malicious prosecution of Plaintiff on charges for which the Defendants could not establish even a prima facie case on any of the criminal surcharges they had brought; and

i.   The Defendants' acts of false reporting (or not truthful reporting) were done in concert to avoid the detection of their unlawful and un-Constitutional acts.

98.   Each one of the foregoing evidences a meeting of the minds and an understanding between the Defendants Goldsmith and Julius, which has as its intended object, the deprivation of the Constitutionally protected rights of the Plaintiff.

99.   Although an express agreement among the Defendant conspirators is not a necessary element of civil conspiracy where, as here, participants in the conspiracy shared a general objective and/or the same motives for desiring the intended conspirational result, to wit, the arrest and prosecution of a person who committed no crime, the words exchanged between Defendants Goldsmith and Julius overheard by Plaintiff, to wit, "This isn't positive," and the response, "Well . . . make it positive," constitute an express

agreement making out a civil conspiracy to violate Plaintiff's Constitutional rights.

100. The other Defendants, by their individual acts, and in combination facilitated, then joined and furthered that conspiracy and conjoined and adopted its general goals, and thereby rendered the individual acts of Defendants Goldsmith and Julius, their very own.

101. The Supreme Court's construction of the Civil Rights Act of 1871, 42 U.S.C. § 1983, provides a private cause of action for a violation of civil rights.

102. Liability under § 1983 extends from the PSP Defendants in this case to Defendant Safariland, LLC, a private corporation, by operation of the doctrine of civil conspiracy, whereby the Defendants formed confederacies and entered into agreements or tacit understandings to individually, jointly and in conspiracy with each other permit the marketing and use of the NIK Test Kit "G" by lawful and/or unlawful means, including, inter alia, the tortious conduct of suppressing their knowledge of the test's susceptibility to false positive results, and false reporting, and of placing them into the stream of commerce without adequate testing and adequate warnings, knowing they would be used by law enforcement personnel such as the

28

individual Defendants here to arrest, prosecute and incarcerate innocent citizens like Plaintiff.

103. This combination of two or more Defendants involved state action, as their agreement was predicated upon the use of the NIK Test Kit "G" by Defendant members of the Pennsylvania State Police acting under color of state law, in a way which would result in the deprivation of civil rights of persons such as Plaintiff.

104. In such combination, the Defendants agreed to do a lawful act by unlawful means and/or a lawful act for an unlawful purpose.

105. Specifically, the Defendants agreed that persons such as Goldsmith and Julius, as individual members of law enforcement, could and would exercise their lawful ability to arrest and prosecute citizens, by the unlawful means of the use of the NIK Test Kit "G" based either upon test results which were known to be unreliable or, upon alleged test results whose manipulation and/or false reporting was not sufficiently guarded against and, which could not otherwise be easily detected.

106. Said agreement, also included the Defendants use of a defective NIK Test Kit "G" for the unlawful purpose of arresting and prosecuting innocent citizens.

107. This meeting of the minds also served the desire of the PSP Defendants to increase the convenience and multiply the gross number of drug-related arrests, and the symbiotic desire of Defendants Safariland and Doe to sell and distribute their product in greater numbers, at increased profit.

108. It is also believed, and therefore averred, that this agreement may have included an understanding that Defendant Safariland would provide litigation support, including, inter alia, expert testimony, if the reliability of its product's test results ever became an issue.

109. As a further extension of this conspiracy and/or, as a § 1983 Civil conspiracy complete by itself, the Supervisory Defendants, tacitly or otherwise, did also agree to, and did, turn a blind eye to this conspiracy and its furtherance, and by adopting its goals, did agree to the sacrificing of citizens such as Plaintiff's civil rights, for the increased production of arrests, criminal prosecutions, and potential convictions.

110. The Defendants formed conspiracies, and entered into agreements or tacit understandings, to individually, jointly and in conspiracy, utilize the defective NIK Test Kit "G" in such a manner as would knowingly subject innocent citizens to the Kit's false test results and the direct and foreseeable Constitutional harms which such false test results would knowingly inflict,

including, <u>inter alia</u>, false arrest, malicious prosecution and false detention /
imprisonment.

111. Defendant Safariland also used unlawful means to market the field test
device by suppressing their knowledge of the dangers of false positive test
results, and by placing their device into the stream of commerce without
adequate testing or warnings or modifications necessary to reduce the
unConstitutional harms, which would inevitably follow.

112. The remaining Defendants, either by training or actual experience, were
aware, or should reasonably have been aware, of the direct Constitutional
violations which would result from arresting, detaining and prosecuting a
victim of false positive test results and they either: 1) intentionally used
those false results to deprive Plaintiff of his Constitutional rights; or, 2)
falsely reported true field test results; and, were deliberately indifferent to
the Constitutionally violative consequences flowing directly from the false
positive results, or false reporting of negative results.

113. Further, at the time of entering into this civil conspiracy, all Defendants
shared the common understanding that:

        a.    the NIK Test Kit G was capable of producing false positive
              readings;

b.   those false positive readings would be used by law enforcement to falsely arrest, maliciously prosecute and falsely incarcerate innocent citizens like Plaintiff;

c.   even if the NIK Test Kit G produced an accurate field test (resulting, for example, in a negative finding for the presence of a controlled substance), the test was not designed nor constructed to create a lasting record of its results, facilitating, if not encouraging, false reporting by any testing member of law enforcement, like Defendants Goldsmith and Julius, and that;

d.   inflicting the resulting false arrests, malicious prosecutions and false imprisonments of innocent citizens was an acceptable by-product of the Defendants continued use of the NIK Test Kit G.

114. The Defendants further agreed that the considerations of the testers' convenience and personal motivations, and the manufacturer's (Defendant Safariland's) profit motive, outweighed the fundamental Constitutional rights of a citizen, like Plaintiff, to be free from false arrest, malicious prosecution and false imprisonment.

115. Each Defendant was personally involved in advancing the objectives of the conspiracy through their own acts and omissions, without which Plaintiff's Constitutional injuries, detailed herein would not have occurred.

116. It is also clear from the foregoing that the Defendants:

    a.    engaged in a single plan, the essential nature and general scope of which was know by them;

    b.    executed that plan in a coordinated way and by a common design which had as its probable and natural consequence the violation of Plaintiff's Constitutional rights as set forth herein;

    c.    acted in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which was an agreement between them to inflict a wrong against, or injury upon, Plaintiff as more fully set forth herein; and

    d.    as a direct and proximate result of the foregoing, and the overt acts described hereinbefore, Plaintiff suffered the damages enumerated.

117. These actions and circumstances, pre-discovery, would, in and of themselves, warrant a reasonable fact finder in concluding that the

Defendants, formed a conspiracy to deprive the Plaintiff of his Constitutionally protected rights because:

    a.    They formed a combination which Goldsmith and Julius facilitated together, committing the unConstitutional and criminal acts of false arrest, false imprisonment and malicious prosecution;

    b.    This constitutes a "conspiracy"; and

    c.    By being state actors who used their conspiracy to deprive the Plaintiff of his Constitutionally protected civil rights as described, each is liable for the harms inflicted upon the Plaintiff as a result of their concerted actions.

118. This conspiracy, as it applied to the Plaintiff herein, was an express or implied agreement between the Defendants, to deprive the Plaintiff of several of his Constitutional rights, inter alia, to assemble; to be free from unlawful search; seizure, and arrest; to be at his liberty without unlawful confinement; to freely associate; and to pursue life, liberty and happiness without fear of malicious prosecution and/or unConstitutional abuse.

119. The Defendants were voluntary participants in the common venture, understood the general objectives of the plan, and knew it involved the likelihood of the deprivation of Constitutional rights, accepted those

general objectives, and then agreed, either explicitly or implicitly, to do their part to further those objectives.

120. The Defendants then did each, either act, or where there was a duty to act, refrained from acting, in a manner intended to facilitate the deprivation of Plaintiff's Constitutional rights as alleged.

121. An actual deprivation of those rights did occur to the Plaintiff resulting from the said agreement or common design, and as a foreseeable consequence thereof.

122. The Defendants, and each of them, are jointly and severally responsible for the injuries caused by their fellow co-conspirators even if, or when, their own personal acts or omissions did not proximately contribute to the injuries or other harms which resulted.

123. As a result of the civil conspiracy entered into and acted upon by the Defendants and other co-conspirators, Plaintiff suffered a deprivation of his Constitutional rights, and suffered damages as stated herein.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against all Defendants, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania.

## COUNT V
### 42 U.S.C. § 1983
### Supervisory Liability
### *Against The PSP Supervisors*

124.    The preceding paragraphs are incorporated herein by reference as though fully set forth.

125.    The, "Supervisory Defendants" exercised supervisory authority over Defendants Goldsmith and Julius, their subordinates.

126.    As such, each is liable for the Constitutional harms and injuries suffered by Plaintiff which are a direct result of the Supervisory Defendants failure to properly train and/or supervise their subordinate Defendants, Goldsmith and Julius, and the Supervisory Defendants concurrent deliberate indifference to the Constitutional rights of persons like the Plaintiff, with whom the untrained Defendants came into contact.

127.    The Supervisory Defendants had personal knowledge of the Constitutional risks associated with their failure to properly train and/or supervise their subordinates, like Defendants, Goldsmith and Julius, regarding the use, reporting, and consequent Constitutional harms likely to be inflicted by, and through their implementation of, the NIK Test Kit "G" as a predicate for the arrest, prosecution and imprisonment of innocent citizens like Plaintiff.

36

128.  Furthermore, those risks were obvious to all Defendants .

129.  The Supervisory Defendants also each had advance personal knowledge that the past policies, regulations and practices, including those related to training and discipline, all of which they were personally responsible for promulgating, monitoring, enforcing and if needed, modifying, were deficient to the point that they had allowed, if not caused, (and were likely to allow and/or cause in the indeterminate future), Constitutional harms precisely like those which were suffered by Plaintiff here.

130.  Further, in their supervising capacities, each Defendant had the obligations to, inter alia:

    i.    use only accurate and reliable field tests to test for controlled substances such as cocaine;

    ii.    discontinue the use of field tests which produced false results, whatever the cause;

    iii.    properly train subordinate like Defendants Goldsmith and Julius in the use of, the accurate reporting of and the fallibility and limitations of the NIK Test Kit "G" and the obvious legal ramifications of the reporting of a false positive test result;

iv.    establish protocols limiting the use of the NIK as the predicate for arrest, incarceration and prosecution, so as to better avoid the false arrest, malicious prosecution and false imprisonment of an innocent citizen such as Plaintiff;

v.     establish protocols which were capable of identifying those instances where false positive rest results had occurred in the past in an effort to avoid and/or limit recurrence, by requiring such things as full reporting of all circumstances concerning the testing, including the identity of the testers, the date of the tests, the devices utilized, and any subsequent accurate laboratory findings;

vi.    require each such instance of false positive drug test results to be fully investigated, reported, and appropriately acted upon so as to minimize, if not eliminate, all consequent Constitutional harms to the innocent citizen;

vii.   to identify and promptly and fully respond to patterns of test or tester deficiencies after careful analysis of field test false positives, especially those associated with the NIK Test Kit "G";

viii.  to promptly and openly discipline field testers for false arrests, malicious prosecutions and false imprisonments which are the

38

product of their acts or omissions, especially those which are
multiple and/or intentional;

ix.    to impose remedial training where needed;

x.    to discontinue use of field test devices which are known to
produce false positives or, at least, prohibit their use as a
predicate for arrest, prosecution and imprisonment;

xi.    to establish, enforce and discipline violations of appropriate rules,
regulations and policies regarding the foregoing, so as to avoid
Constitutional violations of citizens' rights; and

xii.    to create a workable policy whereby citizens who are subject to
violations of their Constitutional rights are encouraged to report
those violations in a prompt, simple, effective and non-retaliatory
manner, where they are promptly and fully responded to and,
where the citizen is advised of the disciplinary and/or remedial
results of his Complaint.

131.    The Supervisory Defendants, one and/or all of them were deliberately
indifferent to these known obligations and failed to satisfy them,
leading directly and inevitably to the Constitutional harms by Plaintiff
here.

132. The Supervisory Defendants, as high-ranking Pennsylvania State Police Officials, tolerated, acquiesced in, condoned and ratified a pattern of false test reporting within the department which existed prior to the events complained of here, and which had become a widespread custom.

133. The Supervisory Defendants failed to establish, promulgate, recommend and/or enforce appropriate rules, regulations and/or policies directed at avoiding false test reporting and/or false test results, which they either knew, or should have known, had produced false arrests, malicious prosecutions and false imprisonments of innocent citizens in the past; and failed to ensure that subordinate members of the State Police, like Defendants Goldsmith and Julius, were properly trained; and, failed to ensure that their false reporting here and, in other instances, were the proper subject of investigation, discipline, retraining and, otherwise remediated, including by the modification of the aforesaid rules, regulations and or policies, as needed.

134. The Supervisory Defendants are liable to Plaintiff, jointly and severally, under well established Section 1983 supervisory liability jurisprudence because they, inter alia:

40

a.    failed to adopt, implement and enforce necessary regulations and/or policies to avoid arrests predicated upon false field test results and/or false reporting of true field test results;

b.    failed to adopt, implement and enforce necessary regulations and/or policies which would readily track both the field test results and, state police members who were testers / observers where alleged preliminary field tests were contradicted by subsequent laboratory testing;

c.    failed to adopt, implement and enforce necessary regulations and/or policies which mitigated against the unlawful and/or unconstitutional arrest of persons based upon field tests results which were later proved false, whether because of a malfunction or other defect in the test, its administration, or false reporting by state police members;

d.    failed to appropriately train members of the state police, including the individual Defendants herein, in the proper means of administering, recording, reporting and preserving the test results;

41

e.     failed to discontinue the use of field tests which produced false results, either by a defect in the test, negligent administration, or negligent and/or false reporting;

f.     failed to promptly and accurately advise the test kit manufacturer (i.e. Defendant Safariland) of false positive test results when they occurred and the circumstances surrounding them;

g.     failed to adopt, implement and enforce regulations and/or policies requiring and independent means of memorializing the test results or, otherwise preserving them as evidence and/or for revalidation;

h.     failed to adopt, implement and enforce regulations and/or policies which mitigate the Constitutional deprivations Plaintiff suffered here from a false positive field test;

i.     failed to demand from Defendant Safariland continuous statistical reporting of the false positives alleged to have been experienced by those utilizing NIK Test Kit "G", as well as statistical reporting as to those tests which have been continued to have produced false positives;

j.     failed to maintain its own statistical reporting concerning false positive allegations, as well as proofs, within its Troops, and

within its statewide network, especially those regarding NIK Test Kit "G";

k.  failed to adopt, implement and/or enforce regulations and/or policies for the investigation of false positive field test results, especially with regard to NIK Test Kit "G", so that the source of said false positive results could be identified and remediated, if not eliminated;

l.  failed to independently investigate the reliability of NIK Test Kit "G" in its use by the Pennsylvania State Police, as well as other law enforcement entities, including identifying alternative field tests of greater reliability;

m.  failed to routinely investigate personnel whose efforts produced claims of false positive test reports;

n.  failed to adopt policies, practices, regulations and/or procedures to prevent, remediate and/or overcome the aforementioned deficiencies; and

o.  failed to impose remedial training and/or discipline, and/or failed to adopt, implement and enforce regulations and/or policies calling for same, regarding subordinates whose use of the test

produced false positive results which they prosecuted, especially where a malfunction has been determined to have occurred.

135.  These failures on the part of the Supervisory Defendants evidence their actual knowledge and acquiescene in the establishment and maintenance of a policy, practice or custom which was deliberately indifferent to the rights of persons like the Plaintiff, and which directly caused the Constitutional harms he was caused to suffer at the hands of the Supervisory Defendants and subordinates Defendants Goldsmith and Julius.

136.  The Supervisory Defendants were the moving force behind the Constitutional violations of their subordinates because their failed conduct, as described herein, exhibited deliberate indifference to the plight of Plaintiff and all other similarly situated citizens, and their individual and collective Constitutional rights.

137.  The Supervisory Defendants' existing custom or practice, without the specific supervisory practices or procedures enunciated herein, created an unreasonable risk that persons like Plaintiff would be the victim of a false arrest, false imprisonment and malicious prosecution under the circumstances presented.

44

138. The Supervisory Defendants were aware that this unreasonable risk existed prior to the time of Plaintiff's Constitutional deprivations.

139. The Plaintiff's harm described herein, directly resulted from the Supervisory Defendants' failure to employ the subject supervisory practices or procedures.

140. Accordingly, because the Supervisory Defendants established and maintained a policy, practice or custom which directly caused the Constitutional harms alleged by Plaintiff; because there existed a prior pattern of incidents similar to that which occurred here, and were condoned by the Supervisory Defendants who were deliberately indifferent to same; because they failed to adopt and/or enforce rules, regulations, policies, discipline and/or more training when the need for same was both great and obvious; and, because they acted as the persons in charge who had knowledge of, and acquiesced in their subordinates, Defendants Goldsmith's and Julius' violations, as indicated, they are liable to Plaintiff for the damages claimed herein.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against the PSP Supervisory Defendants, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand

Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania.

### COUNT VI
### 42 U.S.C. § 1983
### Private Corporate Liability Against Defendant Safariland, LLC

141.   The preceding paragraphs are incorporated herein by reference as though fully set forth.

142.   The Constitutional deprivations which occurred here directly resulted from an official custom, practice or policy of Defendant Safariland or, alternatively, from the actions of an official of the corporation with authority to establish that policy.

143.   Said custom, practice or policy was carried out with deliberate indifference to its consequences, resulting in the precise Constitutional harms suffered by Plaintiff, as alleged herein.

144.   As stated herein, Defendant Safariland is a non-state actor and, a private corporation, which contracted with the Commonwealth of Pennsylvania and/or the Pennsylvania State Police, employers of the Defendants herein, to supply the subject NIK Test Kit "G."

145.   The interdependent nature of the relationship between Safariland and the other state actors is obvious in that, prior to Plaintiff's false arrest, false imprisonment and malicious prosecution, all Defendants,

including specifically Safariland, knew that the Test Kit "G" which was supplied:

a.  had produced false positive results in the past;

b.  was not designed to be, and was not utilized in a fashion such that, its results were corroborated in any way prior to their use as a predicate for arresting, prosecuting and imprisoning citizens;

c.  was also entirely dependent upon the often lacking proper training, competency and honesty of the person(s) doing the testing and/or reporting the results;

d.  could, and had, resulted in citizen's false arrests, malicious prosecutions and false imprisonments, together with the infliction of Constitutional and other harms;

e.  needed to be, and was not, closely monitored and catalogued in its actual use so as to detect and to determine when, how often, under what circumstances and by which officers false positive test results were being reported;

f.  required, but didn't receive, independent investigation of each instance of false positive results, especially those which resulted in arrest, prosecution and/or imprisonment;

47

g.    required, but did not receive, continuous, on-going, communication between and among the PSP Defendants, and between and among the Supervisory PSP Defendants, Defendant Safariland and Distributor Doe, regarding the details of false positive test results and efforts necessary to minimize, if not eliminate them and their horrific, resulting legal, personal and Constitutional harms;

h.    required better and more honest and objective warnings and/or instructions concerning the Kit's use and its actual limitations; and

i.    was otherwise defective.

146.    The Defendant Manufacturer, Safariland, was aware of the defects inherent in the NIK Test Kit "G's" design, manufacture, warnings, and instructions and nonetheless, was deliberately indifferent to same, and placed its product into the stream of commerce knowing that the precise Constitutional and other harms which befell Plaintiff, would ultimately, and inevitably occur to innocent citizens as a direct and proximate result of the device's use, or abuse.

147.    Safariland made no reasonable effort to make the PSP Defendants aware of these deficiencies and the Constitutional and other risks they

posed to the people like Plaintiff with whom, Defendants Goldsmith and Julius would likely come into contact, prior to Plaintiff's arrest, and yet, they acquiesced and condoned them as a matter of their own custom, policy and/or practice.

148.    Safariland made no reasonable effort to make Defendants Goldsmith and Julius aware of these deficiencies and thereby allowed them to exploit them so as to subject the Plaintiff to the Constitutional and other damages claimed herein.

149.    Further, all Defendants engaged in one or more interlocking conspiracies with the common objective of allowing, condoning, if not guaranteeing, that innocent citizens like Plaintiff would, ultimately suffer the Constitutional deprivations which would not be fully possible without the assistance of each of the Defendants, thereby demonstrating the close nexus between Safariland and the state actor Defendants.

150.    Furthermore, Safariland adopted a policy, practice and/or custom, that caused the Constitutional violations alleged.

151.    Specifically, it was part of Safariland's policy, practice or custom to sell narcotics identification kits (i.e. the NIK Test Kit "G") to law enforcement, and in particular to the Pennsylvania State Police and/or the Commonwealth of Pennsylvania, for the express purpose of

determining the presence of cocaine, knowing full well, and deliberately indifferent to the fact that:

a.  said device was not a scientifically reliable determiner of the presence of cocaine and would produce "false positives" and, allow false reporting; and that

b.  innocent citizens would be subject to false arrest, malicious prosecution and unlawful imprisonment as a direct and proximate result of said false positives, or false reporting, at the hands of persons like Defendants Goldsmith and Julius.

152.  Plaintiff's false arrest, malicious prosecution and false imprisonment, and all the collateral damages which flowed therefrom, and are identified herein, are the direct and proximate result of Safariland's policy, practice or custom, and represented a corporate policy of knowingly and deliberately sacrificing Constitutional rights of innocent persons such as Plaintiff's, in exchange for corporate profits.

153.  Defendant Safariland not only acquiesced in, but condoned, prior acts of false arrest, malicious prosecution and false imprisonment of innocent citizens by:

     a.     failing to take any action to remediate and/or minimize or eliminate, the design and/or manufactured defects inherent in their NIK Test Kit "G";

     b.     failing to take any action to remediate and/or modify the defective warnings, instructions and/or training, which accompanied its NIK Test Kit "G";

     c.     failing to establish a credible and accurate reporting system for the false positives which appeared as test results of users, and/or instances of false reporting, and the Constitutional consequences which attended them;

     d.     and, in the event that such a system were in place, failing to have the results independently verified and prominently published and disclosed for appropriate consideration and response by the judiciary, law enforcement and the citizenry; and

     e.     actually suppressing the known incidence of false positive results and/or false reporting of test results produced by users of the NIK Test Kit "G".

154.     As a direct and proximate result of the Constitutional harms and collateral damages which resulted from Safariland's policies, practices and/or customs, and its deliberate indifference to the Constitutional

51

rights of the Plaintiff referenced herein, Safariland is liable to Plaintiff for same.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against Defendant Safariland, LLC, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania.

### COUNT VII
**False Arrest and Illegal (False) Imprisonment**
*Against Individual Defendants Goldsmith and Julius*

155.    The preceding paragraphs are incorporated herein by reference as though fully set forth.

156.    Defendants Goldsmith and Julius illegally arrested Plaintiff and further illegally imprisoned Plaintiff.

157.    As a result of their false arrest and illegal imprisonment, Plaintiff suffered the damages stated herein.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against Defendants Goldsmith and Julius, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania.

## COUNT VIII
## Malicious Prosecution
### *Against Individual Defendants Goldsmith and Julius*

158.     The preceding paragraphs are incorporated herein by reference as though fully set forth.

159.     Defendants initiated, encouraged, planned or facilitated, the bringing of criminal proceedings against Plaintiff and did so maliciously and without probable cause, resulting in a dismissal of all charges against the Plaintiff.

160.     As a result of said malicious prosecution, Plaintiff suffered damages as aforesaid.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against Defendants Goldsmith and Julius, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania.

## COUNT IX
## Civil Conspiracy
### *Against All Defendants*

161.     The preceding paragraphs are incorporated herein by reference as though fully set forth.

162.    All Defendants conspired to engage in the tortious State claims alleged herein in Counts VII and VIII whereby each Defendant acted in concert, pursuant to an agreement, to cause the stated harms or in some way facilitated the conspiratorial objective of inflicting the resulting harms upon the Plaintiff by their own acts or omissions or by those of fellow co-conspirators.

163.    As a result of the aforesaid conspiracy engaged in by the Defendants, Plaintiff suffered the damages stated herein.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against all Defendants jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania.

## COUNT X
### State Constitutional Violations
#### *Against All Defendants*

164.    The preceding paragraphs are incorporated herein by reference as though fully set forth.

165.    The conduct of the Defendants, as alleged herein, was violative of the Plaintiff's rights under the cognate provisions of the Pennsylvania Constitution which have either been interpreted as being co-extensive

with the rights afforded to the Plaintiff under the United States Constitution, or more extensive than those rights as interpreted by our Supreme Court.

166.     To the extent that Plaintiff's ability to assert a private cause of action for damages under the Pennsylvania Constitution has not been settled by the Supreme Court of Pennsylvania, Plaintiff preserves that claim.

167.     To the extent that Plaintiff's ability to assert a claim for injunctive / equitable relief has been confirmed by all Courts of competent jurisdiction, including the Pennsylvania Supreme Court, Plaintiff herewith asserts: that without the grant of appropriate injunctive equitable relief by this Court, the acts of the Defendants which gave rise to this action, will continue unabated; that monetary damages alone would not act as a sufficient deterrent to future unConstitutional conduct by these Defendants and each of them; and that the likelihood of the Plaintiff, and others similarly situated, being subjected to future Constitutional deprivations by these Defendants, or one or more of them, is real and not imagined, and even likely.

168.     Accordingly, Plaintiff hereby claims not only the right to damages as alleged herein but also, equitable relief sufficient to prevent the Constitutional violations asserted here from recurring, and that such

equitable relief be awarded in whatever form the Court deems right and just so to do.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against all Defendants jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with such other injunctive relief this Court deems to be just and proper to award.

## COUNT XI
### Negligence – Product Liability
### *Against Safariland, LLC and John Doe Distributors*

169. The preceding paragraphs are incorporated herein by reference as though fully set forth.

170. At all times pertinent to the within claims, Defendant Safariland, LLC was the designer, manufacturer, seller and distributor of the NIK Test Kit "G" referenced herein.

171. At all times pertinent to the within claims, Defendant John Doe Distributors, whose true identity is presently unknown, but, is believed to be a person(s) or entity whose identity will be made known during the course of discovery, engaged in the practice of distributing the NIK Test Kit "G" referenced herein.

172.   Defendant Sarariland was, at all times pertinent to the claims made
       herein, fully aware that the NIK Test Kit "G" which it designed,
       manufactured, sold and distributed, was either defective because it was
       not entirely specific for the chemical compound cocaine HCL / Cocaine
       base, and/or because it would otherwise, by reason of other defects
       and/or malfunctions, produce a "false positive test result."

173.   The Defendants, as entities or persons who were, and are, engaged in
       the business of selling the NIK Test Kit "G," were and are, subject to
       both a duty of care in designing, manufacturing, selling and distributing
       it, and a duty to sell and/or distribute it free from a defective condition.

174.   Notwithstanding Defendants' actual or constructive knowledge that the
       NIK Test Kit "G" was defective, and despite their clear duty to refrain
       from doing so, the Defendant negligently or deliberately, introduced
       into the market, or continued its previous tender, of the said Kit,
       knowing further that it would be relied upon by test performing
       members of law enforcement, to deprive innocent people of their
       Constitutional rights, and their liberty, and to subject them to unlawful
       arrest, unlawful imprisonment and malicious prosecution.

175.   Defendant Safariland, LLC therefore failed to exercise ordinary care in
       the   design,   research,   development,   manufacture,   testing,   and/or

distribution of the NIK Test Kit "G" such that a defect existed when it left the hands of Defendants, which defect produced the false positive test results which were a substantial factor in bringing about all the harms and damages to Plaintiff, as claimed herein.

176. The forseable risk of harm to citizens like Plaintiff, whose liberty and property interests would be subject to NIK Test Kit "G" testing, and the false positive test results it was capable of producing, was, or should have been, reasonably known to Defendants, and included precisely the harms, dangers and damages to which Plaintiff was subjected here.

177. The Defendants are obligated under law to give such instructions and warnings as are required to inform the users, consumers and bystanders of the possible risks and inherent limitations of their product.

178. The NIK Test Kit "G" was also defective because it was accompanied by inadequate instructions as to its proper deployment and use, and the proper interpretations and use of its test results.

179. The NIK Test Kit "G" was also defective because it was not accompanied be adequate warnings as to the possibility of false positive results and the need for independent (e.g. laboratory) corroboration of the test results.

180.    The forseable risks of harm posed by law enforcement's use of the Kit's false results could have been reduced or avoided in the circumstances <u>sub judice</u> by the provision of reasonable instructions and/or warnings by the Defendants and, the omission of those reasonably necessary instructions and/or warnings rendered the NIK Test Kit "G" not reasonably safe for its intended use of accurate cocaine detection.

181.    The social utility of not subjecting innocent citizens like Plaintiff to the Constitutional infringements and resulting further harms he was caused to suffer, certainly warrants the minimal efforts and expense associated with providing adequate written instructions and warnings.

182.    The defects in design include, <u>inter alia</u>, the following:

(1)    The Kits had a singular intended purpose, to wit, the accurate detection of the presence of the chemical compound cocaine HCL / Cocaine base and yet, its defective design inaccurately detected the presence of cocaine HCL / cocaine base when none was present;

(2)    The Kits defective design allowed its results to be manipulated by law enforcement testers / reporters;

(3)    The Kits defective design failed to memorialize the test results for subsequent verification and/or corroboration or, if

it arguably did, its use, as designed, failed to include any permanent retention of the test results; and

(4)     The Kit's defective design encouraged the false reporting of test results since the Kit provided no means of re-examining actual test results.

183.    The defects in manufacture include, <u>inter alia</u>, the following:

(1)     The Kits defective manufacture produced a device which rendered false positive results;

(2)     The Kits were without reasonable instructions and/or warnings which would avoid common errors in its use;

(3)     The Kits were without reasonable instructions and/or warnings so as to render its use reliable or its results confirmable by subsequent examination by others, including, the victim, experts, courts and/or juries; and

(4)     The instructions and/or warnings were so dismissive of false positives or inaccurate results that law enforcement users and the independent judiciary were mislead into using or, allowing to be used, the results as a predicate for unlawful arrests, malicious prosecutions and false imprisonments.

184.    Accordingly:

(1)    The Defendants owed Plaintiff a duty;

(2)    The Defendants breached that duty;

(3)    The breach caused Plaintiff's injuries; and

(4)    The said injures were proximately caused by the specific defects in design, manufacture and/or in the inadequacy of the warnings and instructions accompanying the NIK Test Kit "G's" a product which was also negligently distributed and used in its unaltered form and, in its instructed way.

185.    The nature, degree and length of time the Defendants have intentionally, recklessly and willfully engaged in the conduct ascribed to it, and the extreme harm it has brought to Plaintiff and others, were a calculated risk taken at the expense of unknowing citizen victims, solely to benefit the Defendants profits, and as such, are reprehensible and outrageous acts not to be tolerated in a civilized society; warranting the imposition of punitive as well as compensatory damages.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against Defendants Safariland, LLC and John Doe Distributors, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal

District Court for the Eastern District of Pennsylvania, together with such other injunctive relief this Court deems to be just and proper to award.

### COUNT XII
### Strict Liability
### (Restatement (2d) of Torts Section 402A)
#### *Against Safariland, LLC and John Doe Distributors*

186.    The preceding paragraphs are incorporated herein by reference as though fully set forth, most especially those appearing in Count XI wherein the foundational product liability claims against Safariland, LLC and John Doe Distributors are stated, et extenso.

187.    The Defendants Manufacturer and Distributor, Safariland, LLC and John Doe Distributor, are strictly liable for the harms and damages sustained by Plaintiff as alleged herein because it placed its NIK Test Kit "G" into the stream of commerce in a defective condition, in as much as the danger of its product's production of a false positive test result for the chemical compound cocaine HCL / cocaine base in the hands of members of law enforcement is unknowable and unacceptable to the average or ordinary consumer; and/or a reasonable person would conclude that the probability and seriousness of harm caused by the Kits production of false positive test results, outweigh the burden or costs of taking precautions to minimize or, to eliminate the harm it presented.

188.    The nature, degree and length of time the Defendants have intentionally, recklessly and willfully engaged in the conduct ascribed to it, and the extreme harm it has brought to Plaintiff and others were a calculated risk taken at the expense of unknowing citizen victims, solely to benefit the Defendants profits, and as such, are reprehensible and outrageous acts not to be tolerated in a civilized society; warranting the imposition of punitive as well as compensatory damages

WHEREFORE, Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against Defendants Safariland, LLC and John Doe Distributors, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with such other injunctive relief this Court deems to be just and proper to award.

## OTHER

189.   Plaintiff respectfully requests a jury trial.

190.   The within case is not subject to arbitration.

191.   Where permitted, the Plaintiff demands reasonable legal fees, costs, interest, expenses, delay damages, compensatory damages, punitive damages and any other damages deemed appropriate by the Court.

192.  Plaintiff requests that this Honorable Court issue declaratory and injunctive relief, as appropriate, declaring the within described practices to be unlawful, and enjoining their present and continued effects.

179.  The conduct of each Defendant was willful, wanton, deliberate, intentional and calculated to bring about the very Constitutional harms which were visited upon Plaintiff and constitute reprehensible and outrageous acts not to be tolerated in a civilized society, warranting the imposition of punitive as well as compensatory damages.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court for each Count alleged:

        a.    Award compensatory damages to Plaintiff against the Defendants, jointly and severally, in an amount in excess of $150,000.00 exclusive of interest and costs;

        b.    Award punitive damages to Plaintiff against the individual Defendants in their individual capacities, jointly and severally, in an amount in excess of $150,000.00 exclusive of interest and costs;

        c.    Award reasonable attorney's fees and costs to the Plaintiff, as may be awardable pursuant to 42 U.S.C. Section 1988, the Civil Rights Attorney's Fees Award Act of 1976, or any other applicable provisions;

d.    Enter an Order enjoining Defendants from engaging in the future in the conduct identified in the Complaint as violative of 42 U.S.C. § 1983, the 4th and 14th Amendments of the Constitution of the United States, the cognate provisions of the Pennsylvania Constitution; and further affirmatively requiring the Defendants to engage in appropriate remedial efforts to adopt, and enforce, policies that are calculated and intended to preclude the conduct alleged to have been engaged in by the Defendants named herein; and

e.    Award such other and further relief, as this Court may deem appropriate.

Respectfully Submitted,
KAROLY LAW FIRM, LLC

Dated: November 12, 2015               By: _____

Joshua E. Karoly, Esquire
PA Attorney I.D. # 206076
527 Hamilton Street
Allentown, PA 18101
(610) 437-1252
j.karoly@karolyfirm.com
Attorney for Plaintiff

65